THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.

UNITED STATES, *ex. rel.*
ELMER MOSLEY, PH.D., R. PH.

      Plaintiff/Relator

v.                        **FILED UNDER SEAL**

WALGREEN CO.,

      Defendant.

_____/

FILED BY _____ D.C.

MAY 1 0 2019

ANGELA L. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## COMPLAINT

    The Relator, Elmer Mosley, Ph.D., R. Ph., files this action in the name of the United States against Walgreen Co. ("Walgreens"), and states as follows:

### INTRODUCTION

    1.    The Relator, Elmer Mosley, Pharm. D., R. Ph. ("Dr. Mosley" or "Relator") files this Complaint pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and alleges that Walgreen Co. ("Walgreens") committed violations of the False Claims Act by illegally filling thousands of prescriptions for powerful opioid painkillers and other controlled substances that had no legitimate medical purpose.  By filling those thousands of illegitimate prescriptions, Walgreens crossed the legal line between pharmacy practice and violating the Controlled Substances Act ("CSA").

### JURISDICTION AND VENUE

    2    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3732(a) and (b) and 28 U.S.C. §§ 1331 & 1367(a).

3.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c), and under 31 U.S.C. § 3732(a) because Walgreens transacts business within the district, and some of the acts proscribed by the False Claims Act occurred within this district.

## THE FALSE CLAIMS ACT

4.     The False Claims Act ("FCA") provides for the award of treble damages and civil penalties for, *inter alia*, knowingly submitting, or causing the submission of, false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

5.     The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> . . .
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 2015 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.

6.     For purposes of the FCA,

> the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

2

## THE PARTIES

### A.    Dr. Mosley

7.      Dr. Mosley is a resident of Palm Beach County and is a duly licensed pharmacist in Florida.  Dr. Mosley has 42 years of experience in the pharmacy industry, all with Walgreens. He retired from Walgreens in November 2018. Dr. Mosley's knowledge of the pharmacy industry includes retail practice, pharmacy store management, district pharmacy management, regional consulting, and pharmacy consulting specialty.

8.      After receiving his Doctor of Pharmacy from Florida A&M University in 1972, Dr. Mosley spent two years as an intern with Walgreens, learning pharmacy management as a pharmacy manager at a store in Chicago, Illinois.  In 1974, Walgreens transferred Dr. Mosley within the company to the Coconut Grove, Florida store to serve as its pharmacy manager.

9.      Shortly after the transfer, Walgreens promoted Dr. Mosley to the dual role of pharmacy manager and executive assistant manager out of a store in Davie, Florida.  In these dual roles, Dr. Mosley was responsible for the oversight, supervision and operation of eight (8) Walgreens pharmacies in the greater Davie and Fort Lauderdale areas.  He also was responsible for scouting potential locations to lease additional stores.

10.     Dr. Mosley maintained these responsibilities until 1992, when Walgreens promoted him to Pharmacy Manager/District Manager Trainee for the Miami North area.  In this new role, Dr. Mosley was responsible for identifying sites for additional stores.

11.     In 1997, Walgreens again promoted Dr. Mosley, transferring him to the northwestern United States as a District Manager.  With this promotion, Walgreens assigned Dr. Mosley the responsibility of identifying prospective lease sites for 35-40 stores throughout

Washington, Oregon, Northern California and Colorado. Dr. Mosley's responsibilities continued to include expanding Walgreens stores in these markets.

12.     In 1998, Walgreens transferred Dr. Mosley to Memphis, Tennessee, as a District Manager, making him responsible for supervising and identifying prospective sites for 42 Walgreens stores in Tennessee, Arkansas, Mississippi, and Southern Illinois. His responsibilities included training pharmacists who worked in these stores.

13.     In 2000, as a District Manager in Memphis, Dr. Mosley began training other pharmacy managers and store managers in the Atlanta, Georgia and Birmingham, Alabama markets. He remained in this role until 2007.

14.     From 2007 until his recent, Dr. Mosley has worked as a Consultant Pharmacy Specialist for Walgreens in critical areas such as HIV and oncology. He also has mentored pharmacy interns and pharmacy school graduates for Walgreens and has served as a diversity recruiter for the company.

**B.     Walgreens**

15.     Walgreens is incorporated in Delaware and maintains its headquarters in Deerfield, Illinois. Across all 50 states, Walgreens operates 8,177 stores and has over 245,000 employees. Its employees include more than 76,000 pharmacists, pharmacy technicians and nurse practitioners.

16.     In 2014, Walgreens merged with Boots Alliance and Walgreens became a subsidiary of the merged entity, Walgreens Boots Alliance Company. After the merger, upon information and belief, Walgreens has remained the billing entity that submits claims to Medicare. Hence, Walgreens is the named defendant in this case.

<center>MEDICARE PART D</center>

**A.     The Medicare Modernization Act of 2003**

17.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or is enrolled under Part B.  *See* 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

18.     Prior to passage of the Act, with a few limited exceptions, Medicare did not cover outpatient prescription drugs.  The new Medicare prescription drug benefits program became effective January 1, 2006.  *See* 42 U.S.C. § 1395w-101(a)(2).  Unlike coverage in Medicare Parts A and B, Part D coverage is not provided within the traditional Medicare program.  Instead, Medicare Part D is based on a private market model.  Medicare contracts with private entities, typically insurance companies, known as Part D Plan "Sponsors" to administer prescription drug plans.  Part D benefits are delivered by a Part D Sponsor, which is normally a Part D prescription drug plan or a Medicare Advantage prescription drug plan.

**B.     Part D Sponsors Regularly Submit "Prescription Drug Event" Data to CMS**

19.     When a pharmacy such as Walgreens dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Sponsor and receives reimbursement from the Part D Sponsor for the costs not paid by the beneficiary. The Part D Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a "Prescription Drug Event" or "PDE" record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy. The PDE includes 37 separate

<center>5</center>

fields of data, including information on the service provider of the drug (fields 10 and 11), the prescriber of the drug (fields 13 and 14), the quantity dispensed and days' supply of the drug (fields 18 and 19), and whether or not the drug is covered under the Medicare Part D benefit (field 22).

20.     Payments to a Part D Sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments to Part D Sponsors for qualified prescription drug coverage. *See* 42 C.F.R. § 423.322. CMS's instructions for the submission of PDE claims data state that "information . . . necessary to carry out this subpart" includes the data elements of a PDE. *See* Exhibit 1, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE) (April 27, 2006).

21.     PDE records are an integral part of the process that enables CMS to administer the Part D benefit. CMS relies on the information in all 37 data fields of a PDE record to process payments and to validate claims. *See* Exhibit 1.

22.     Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program. The data contained in PDEs are data related to the payment of claims. In addition, CMS uses the information in the PDE at the end of the payment year to reconcile its advance payments to the sponsor with actual costs the sponsor incurred. *See* Exhibit 1.

**C.     CMS Reimburses Part D Sponsors Based on the PDE Data**

23.     Throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy designed to cover

the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

24.     The direct subsidy (a monthly capitated payment) is paid to the Part D Sponsor in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. § 423.315(b). In other words, CMS pays a monthly sum to the Part D Sponsor for each Part D beneficiary enrolled in the plan.

25.     CMS also makes payments to the Part D Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782. Cost-sharing subsidies for qualifying low-income individuals are called Low-Income Cost Sharing Subsidies ("LICS") and are documented and reconciled using PDE data submitted to CMS.

26.     The reinsurance subsidy is paid to the Part D Sponsor to cover the Government's share of drug costs above an enrollee's catastrophic threshold.  Part D Sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return monthly payments to CMS during reconciliation.  *See* 42 C.F.R. § 423.343(b), (c)(2) and (d)(2). In addition, Part D Sponsors are responsible for correcting submitted PDE data they determine erroneous.  *See*  Exhibit 1 at 4.

27.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs to calculate final payments and risk sharing amounts. CMS determines the Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

**D.      Part D Sponsors and Pharmacies Must Certify Compliance with all Applicable Federal Laws, Regulations and CMS Instructions**

28.      In order to receive Part D funds from CMS, Part D Sponsors, their authorized agents, employees, and contractors (including pharmacies) are required to comply with all applicable federal laws, regulations, as well as CMS instructions. By statute, all contracts between a Part D Sponsor and the Department of Health and Human Services must include a provision whereby the Part D Sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program. *See* 42 U.S.C. § 1395w-112.

29.      Part D Plan Sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1). CMS regulations require that all subcontracts between Part D Sponsors and downstream entities, such as pharmacies, contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

30.      Walgreens, as a subcontractor for Part D Sponsors, is required to comply with all applicable federal laws, regulations, and CMS instructions designed to prevent fraud, waste and abuse, including but not limited to the False Claims Act (31 U.S.C. § 3729 *et seq.*) and the anti-kickback statute (section 1128B(b) of the Social Security Act). *See* 42 C.F.R. § 423.505(h)1.

31.      A Part D Sponsor is required by federal regulation to certify to the accuracy, completeness and truthfulness of all data related to the payment. This provision, entitled "Certification of data that determine payments," provides in relevant part, as follows:

> (1) General Rule. As a condition for receiving a monthly payment . . . the Part D Plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to

sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

…

(3) Part D Sponsor Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

*See* 42 C.F.R. § 423.505(k)(1) & (3).

32.     All approved Part D Sponsors who received payment under Medicare Part D must submit the required attestations for data submitted that related to payment. *See* 42 C.F.R. § 423.505(k). The "Certification of data that determine payments" provision of the applicable regulation further provides: "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." *See* 42 C.F.R. § 423.505(k)(3).

THE FRAUDULENT SCHEME

**Walgreens Knowingly Dispensed Excessive Quantities of Prescription-Opioid Painkillers Without a Legitimate Medical Purpose and Outside the Usual Course of Professional Pharmacy Practice.**

33.     The United States is enduring an epidemic and national emergency arising from what is commonly referred to as the "Opioid Crisis." The crisis is complex in both cause and effect, but it is clear that pharmacies across the nation, including Walgreens, are complicit with the drug manufacturers in putting profits over patients' health and safety.  Indeed, as the largest pharmacy chain in the country, Walgreens has been a substantial contributor to the Opioid Crisis through its dispensing and distribution of opioids without a legitimate medical purpose and outside the usual course of professional pharmacy practice.

34.     In addition to substantially contributing to this public health emergency -- including causing death or serious bodily injury to many patients and serious emotional and financial consequences to the families -- Walgreens has submitted tens of thousands of false claims to Medicare for improperly dispensed controlled substances.

35.     Walgreens is registered with the U.S. Drug Enforcement Administration ("DEA") and the State of Florida as a chain pharmacy authorized to handle controlled substances in Schedule II of the Controlled Substances Act (the "CSA"), Title 21, United States Code. Schedule II applies to drugs, including opioids, that have a high potential for user abuse, a currently accepted medical use in treatment, and may cause severe psychological or physical dependence. *See* 21 U.S.C. § 812(b)(2). Schedule II drugs include many dangerous and addictive narcotics.  Several of the most frequently abused prescribed Schedule II drugs include Oxycodone (Oxycontin®, Percocet®), Hydromorphone (Dilaudin®), Methadone (Dolophine®), and Fentanyl (Sublimaze®, Duragesic®), among others.

36.     Pursuant to sections 303 and 304 of the CSA (21 U.S.C. §§ 823 and 824) and 21 C.F.R. § 1306.04, a pharmacist filling a prescription for a controlled substance has a corresponding duty to ensure that the prescription was issued for a "legitimate medical purpose" and by a physician acting within his or her usual course of professional practice. *See* 21 C.F.R. § 1306.04. A pharmacist knowingly filling such a prescription, as well as the physician issuing it, are subject to penalties for violations of the laws governing controlled substances. *Id.*

### A.     The Opioid Crisis: Resulting Legislation and Investigations

37.     In 2009, federal and Florida authorities recognized that Florida residents were suffering death or serious injuries as a result of prescribed controlled substance overdoses. One of the most common forms of prescribed controlled substance abuse were Schedule II narcotics such as Oxycodone, Hydromorphone or Methadone, coupled with an over-the-counter pain reliever such as acetaminophen. Pairings with these Schedule II narcotics also included other regulated drugs such as Schedule IV benzodiazepines (tranquilizers) or muscle relaxers.

38.     To help monitor and address some of the opioid abuse, in 2011, the State of Florida began requiring that every pharmacy report to Florida's "E-FORCSE" Prescription Drug Monitoring Program each time a Schedule II controlled substance is dispensed to an individual. *See* Fla. Stat. § 893.055. The E-FORCSE database is accessible by all pharmacies so that practitioners not only have their own controlled substance prescription information, but also all controlled substances dispensed by any other pharmacy.

39.     In the six years since these measures were implemented, the Opioid Crisis, nonetheless, has continued to magnify throughout Florida and the nation. According to the Center for Disease Control and Prevention ("CDC"), in 2017, retail opioid prescriptions were dispensed statewide in Florida at a rate of 60.9 prescriptions per 100 persons residing in Florida.

*See* United States Centers for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps*, https:// www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 14, 2019). By 2017, two of the Florida counties where Relator's specific examples of grossly abusive prescriptions filled by Walgreens occurred, Martin County and Palm Beach County, the rates of opioid prescriptions per 100 residents were 70.3 and 53.4, respectively. *Id.*

**B.      Walgreens' $80 Million Settlement with the Department of Justice Resulting from its Illegal Opioid Dispensing Practices**

40.      In 2011, the DEA initiated an extensive investigation of Walgreens' practices in dispensing controlled substances. The investigation included agent visits to Walgreens' stores in South Florida for the purpose of investigating Walgreens' practice of filling prescriptions for controlled substances. The investigation revealed that Walgreens had a significant pattern and practice of ignoring unresolved, controlled substances red flags that indicated many of the controlled substances prescriptions were not issued for "legitimate medical purposes," as required by the regulations implemented under the CSA. *See* 21 C.F.R. § 1306.04.

41.      The investigation further revealed that the filling of controlled substances prescriptions in Florida was incredibly lucrative for Walgreens. To encourage its stores to fill these prescriptions, Walgreens offered bonuses and incentives to its stores that generated the most revenue from them. As a result, in 2012 and 2013, the Department of Justice ("DOJ") and Drug Enforcement Administration ("DEA") filed various civil enforcement actions against Walgreens resulting from its reckless conduct in violating the CSA.

42.      In June 2013, Walgreens entered into a Settlement and Memorandum of Agreement ("Settlement Agreement") jointly with DOJ and DEA, admitting to multiple violations of the CSA and agreeing to widespread policy changes at all of its pharmacies. Under the Settlement Agreement, Walgreens agreed to pay a civil penalty to the United States of $80

million, the largest civil penalty ever for violations of the CSA. A copy of the Settlement Agreement is attached as Exhibit 2.

43.    To avoid revocation of Walgreens' DEA registration, the most severe civil penalty available that would prevent Walgreens from filling any further controlled substances prescriptions, Walgreens agreed to the following material terms in the Settlement Agreement:

    a.    Walgreens admitted that some of its retail pharmacies dispensed controlled substances prescriptions in violation of the CSA;

    b.    Walgreens admitted in the Settlement Agreement that the "covered conduct" includes, but is not limited to, the following:

        1.    Failing to ensure that its controlled substances prescriptions were dispensed pursuant to prescriptions issued for "legitimate medical purposes" by practitioners acting in the usual course of their professional practice;

        2.    Dispensing controlled substances pursuant to otherwise invalid prescriptions;

        3.    Dispensing controlled substances to individuals it knew or should have known were diverting controlled substances; and

        4.    Dispensing controlled substances prescriptions written by physicians who did not have a valid DEA registration.

*See* Exhibit 2, pp. 2-4. **The geographic scope of the Settlement Agreement applies to all Walgreens' stores nationally**, even if stores outside of South Florida were not specifically identified in any of the orders to show cause.

44.    In the Settlement Agreement, Walgreens further agreed to a new nationwide policy including:

    a.    Walgreens agreed to maintain a compliance program in an effort to detect and prevent diversion of controlled substances, which were applicable to all Walgreens' pharmacies and CPO (Central Pharmacy Operations) facilities;

    b.    Walgreens agreed to establish procedures to identify the common signs associated with the diversion of controlled substances;

c.      Walgreens agreed to conduct routine and periodic training of all Walgreens pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA and corresponding DEA regulations;

d.      Walgreens agreed to implement policies and procedures in an effort to ensure that prescriptions for controlled substances are only dispensed to authorized ultimate users pursuant to federal and state law and regulations;

e.      Walgreens agreed to direct and train its pharmacists that their corresponding responsibility under federal law requires them not to fill a prescription that such pharmacist knows or has reason to know was issued for other than a legitimate medical purpose, or by a practitioner acting outside the usual course of professional practice;

f.      Walgreens agreed to surrender the DEA registrations of several of its retail pharmacies until May 26, 2014;

g.      Walgreens agreed to maintain both electronic and paper copies of its records regarding the dispensing of controlled substances prescriptions;

h.      Walgreens agreed to maintain a company Department of Pharmaceutical Integrity, composed of personnel with pharmacy-related training and managerial personnel, to coordinate compliance efforts related to controlled substances;

i.      Walgreens agreed to properly train its pharmacy personnel to deal with evolving diversion-related issues, including enhancing its "Good Faith Dispensing Policy" and training materials to identify red flags of potential diversion;

j.      Walgreens agreed to maintain procedures to verify that the DEA registration number for the issuing prescriber of a controlled substance is a current, valid registration number;

k.      Walgreens agreed to exclude any accounting for controlled substances prescriptions dispensed by a particular pharmacy from bonus computations for pharmacists and pharmacy technicians.

*See* Exhibit 2, p 6; Addendum, pp. 1-2.

45.      Despite its covenants in the Settlement Agreement, Walgreens has continued to violate the CSA. Walgreens has done so by knowingly and intentionally dispensing controlled

substances outside the usual course of the professional practice of pharmacy; without providing any legitimate training to the pharmacists and their staff; and without ensuring that prescriptions for excessive quantities of opioids served a "legitimate medical purpose" before filling them.

### C. Walgreens' Post-Settlement "Good Faith Dispensing Policy" for Controlled Substances

46.     Following the Settlement Agreement, Walgreens instituted a "Good Faith Dispensing Policy" (the "GFD") that was designed to educate employees about diversion and provide assistance with identifying red flags suggestive of diversion. To enhance the GFD, Walgreens began requiring pharmacists to complete the "Target Good Faith Dispensing Checklist" (the "Target Checklist") every time a controlled substance prescription was presented at a Walgreens' pharmacy, for one of three particular controlled substances. A copy of the Target Checklist is attached as Exhibit 3. In 2015, Walgreens extended the GFD criteria to a pharmacist who seeks to "to fill any controlled substance." A copy of the March 6, 2015 e-mail from District Pharmacy Supervisor, Cesar Cedeno, to all stores in District 22 is attached as Exhibit 4.

47.     The three controlled substances included on the Target Checklist are (1) Oxycodone, (2) Hydromorphone, and (3) Methadone. When a prescription is presented for one of the three drugs to a Walgreens' pharmacist, the pharmacist is required to copy and attach the beneficiary's photo identification, ensure that there have been no prior refusals to fill controlled substances prescriptions pursuant to the GFD, and review the beneficiary's E-FORCSE online Prescription Drug Monitoring Program profile ("PDMP Profile"). In addition to the specified drugs on the Target Checklist, Walgreens would from time to time issue certain directives that other highly abused Schedule II controlled substances, e.g., Fentanyl patches, would be subject to similar protocols, including the identification of "red flags" before dispensing.

48.     The "red flags" on the Target Checklist include:

    a.     Patients presenting controlled substances prescriptions for the first time;

    b.     Patients presenting controlled substances prescriptions from a different medical provider than prior prescriptions;

    c.     Patients presenting controlled substances prescriptions for early refills;

    d.     Patients paying for controlled substances prescriptions with cash or a discount card, or presenting controlled substances prescriptions from cash-only providers;

    e.     Patients presenting chronic controlled substances prescriptions without an explanation or supporting documentation;

    f.     Patients appearing intoxicated or under the influence of illicit drugs when presenting controlled substances prescriptions; and

    g.     The pharmacist is also required to sign a worksheet, indicating whether the prescription was filled or refused, and if refused, the reasons why the prescription was refused.

*See* Exhibit 3. As set forth below in the examples below, however, Walgreens would frequently ignore the red flags, and continued with the same abusive practices that led to the Settlement Agreement, sometimes resulting in tragic consequences for patients, including death or serious bodily injury.

### D.     Walgreens' Continued Violations of the CSA

49.     Despite Walgreens' GFD and Target Checklist, Walgreens continued to fill controlled substances in violation of the CSA. For example, Walgreens issued to all stores affected by the Settlement Agreement a protocol for the acceptance of Schedule II and Schedule III narcotics.

50.     While the protocol applied to Oxycodone, the primary drug that led to the DEA's orders to show cause, it did not expressly apply to Oxycodone or Hydrocodone when combined with acetaminophen. Thus, abusive prescribers and Walgreens quickly gathered they could

perform an easy "end-around" by continuing to fill prescriptions for various Oxycodone and Hydrocodone "cocktail" combinations, and substitute drugs, which pose the same or substantially similar high danger for patients as Oxycodone or Hydrocodone.

51. To effectuate its end-around strategy, Walgreens approved a new list of substitute-controlled substances and cocktails that combined various drugs and avoided compliance with its own GFD and Target Checklist. Walgreens' drug cocktails included combinations of the following:

- Oxycodone/Acetaminophen 5-325
- Oxycodone/Acetaminophen 10-325
- Hydrocodone/Acetaminophen 5-325
- Hydrocodone/Acetaminophen 10-325
- Hydrocodone/Acetaminophen 7.5-325
- Soma 350mg (90-120 tablets) (muscle relaxers)
- Alprazolam bars 1-2mg (90-120 tablets) (anti-anxiety)
- Phenergan cough syrup (240-473 tablets) (codeine)

52. Because these cocktails combinations were not listed specifically on the Target Checklist, Walgreens' pharmacists would not complete the Target Checklist when prescriptions for these cocktails were presented. In recent years, sales of the cocktails spiked, demonstrating that Walgreens benefitted from its circumvention of its duties in the CSA, the FCA and the Settlement Agreement.

### E. Walgreens is Liable under the CSA and FCA for Filling Excessive Opioid Prescriptions Without a Legitimate Medical Purpose

53. Walgreens' ongoing conduct leads not only to violations of the CSA, but also violations of the FCA. This is because the Medicare Part D program can only be used to purchase "covered Part D drugs," which is a defined term under the statute. *See* 42 U.S.C. § 1395w-102(e). When Walgreens fills a prescription for a given drug, it submits electronic Prescription Drug Event ("PDE") data to the Part D Sponsor, which the Sponsor, in turn, uses to

seek payment from the government. When Walgreens submits PDE data, it impliedly certifies that it has filled a prescription for a "covered Part D drug."

54.     If a pharmacy knowingly fills a prescription for a drug that does not meet the definition of "covered Part D drug," and submits for Medicare reimbursement, that pharmacy has submitted a false claim.

55.     The definition of a "covered Part D drug" excludes excessive or medically illegitimate prescriptions.  In particular, 42 U.S.C. § 1395w-102(e) provides as follows:

> **Application of General Exclusion Provisions**
>
> A prescription drug plan or an MA–PD plan may exclude from qualified prescription drug coverage any covered part D drug –
>
> (A) for which payment would not be made if section 1395y(a) of this title applied to this part.

56.     Section 1395y(a), in turn, provides that government funds cannot be used to pay for medical items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a).

57.     Part D explicitly incorporates the "reasonable and necessary" requirements of 42 U.S.C. § 1395y(a).

58.     The requirement that Part D prescriptions must be "reasonable and necessary" coincides with a pharmacist's duties arising under the prescription-drug regulations arising under the CSA. These regulations require that for a controlled substance prescription "to be effective, [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *See* 21 CFR 1306.04.

59.     21 CFR 1306.04 **imposes corresponding duties upon the pharmacist** in addition to the prescribing practitioner as follows:

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but **a corresponding responsibility rests with the pharmacist who fills the prescription**.

21 CFR 1306.04 (emphasis added).

60. The regulations that implement the Part D program, likewise, **impose a similar obligation that controlled substances be dispensed only upon a "valid" prescription**:

> (h) *Valid Prescription*. A Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription.

42 CFR 423.104(h). The regulations further define a "valid prescription" as one "that complies with all applicable State law requirements constituting a valid prescription." 42 CFR 423.100 (definitions).

61. Further, a **pharmacist is required to refuse to fill a prescription** if the pharmacist knows, or has reason to know, that the prescription is not written for a legitimate medical purpose. *See* 21 C.F.R. § 1306.04 ("An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription . . . and the person knowingly filling such a purported prescription . . . shall be subject to . . . violations of the provisions of law relating to controlled substances); Fla. Admin. Code 64B16-27.831(2)(c)("When validating a prescription, if at any time the pharmacist determines that in his or her professional judgment, concerns with the validity of the prescription cannot be resolved, the pharmacist shall refuse to fill or dispense the prescription."). Determining that the prescription is for a legitimate medical purpose requires the pharmacist to pay attention to the number of prescriptions issued, the number of dosage units prescribed, who the doctor is writing the prescriptions, the doctor's area of practice, the doctor's geographic location relative to the patient, and whether the drugs have a high rate of abuse.

62.     The pharmacist has a legal duty to identify red flags that raise a reasonable suspicion that a prescription for a controlled substance is not for a legitimate medical purpose. The existence of any red flags further imposes upon the pharmacist the duty to conduct a reasonable investigation to determine the validity of the prescription, including the dosage units, before filling it, i.e., confirm a legitimate medical purpose exists for the dosage, not just the drug.

63.     Likewise, prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not for "medically accepted indications," and, therefore, are **not covered Medicare Part D drugs**. 32 U.S.C. § 1395w(e)(1). Additionally, such prescriptions also are not covered under Medicare Part D because Florida law does not consider them "valid prescriptions." *See* 42 C.F.R. §§ 423.104(h), 423.100; Fla. Stat. § 893.03(2) (Schedule II drugs are limited to "severely restricted medical use"); Fla. Stat. § 456.44 (prescriptions of Schedule II drugs are limited to treatment of cancer, acute pain, or chronic nonmalignant pain under strict conditions); Fla. Admin. Code 64B16-27.831(1)(b)("A prescription is invalid if the pharmacist knows or has reason to know that the prescription was not issued for a legitimate medical purpose.").

64.     Thus, when a pharmacy submits a PDE to Medicare for controlled substances pursuant to a prescription that lacks a legitimate medical purpose, the submitted claim does not contain accurate, complete and truthful information about all data related to payment.

65.     Compliance with federal and Florida law relating to pharmacies' dispensing of controlled substances is material to Medicare's decision to pay a pharmacy's claim for reimbursement of controlled substances. Compliance with these requirements is central to the Medicare Part D benefit and is a condition of Part D coverage for controlled substances.

66.      Despite these legal duties, Walgreens has routinely filled controlled substances prescriptions, knowing, or having reason to know, the prescribed quantities were so excessively high, no reasonable pharmacist could conclude the drugs were prescribed for a legitimate medical purpose and, therefore, were invalid. Yet, Walgreens, over at least the last 6 years, routinely submitted false claims to Medicare based upon invalid prescriptions and received payment for the claims.

<div style="margin-left:2em">

**F.      Walgreens Has Engaged in a Practice of Filling Prescriptions for Opiates So Excessive in Dosage, a Reasonable Pharmacist Would Not Conclude the Prescriptions Served a Legitimate Medical Purpose**

</div>

67.      Since at least 2013, Walgreens, throughout its South Florida stores, and upon information and belief, nationally, has continued to repeatedly fill tens of thousands of opioid prescriptions for excessive quantities that did not, and could not, have a legitimate medical purpose. In contrast, the filling of these excessive prescriptions continued, occasionally causing death or serious bodily injury to its patients.  While Dr. Mosley himself has witnessed thousands of examples of **Walgreens' "fill at all costs" practice**, he also has been informed by pharmacists at other Walgreens' stores that the same abusive practices he observed were prevalent throughout the South Florida region.

68.      Of the many examples of excessive opioid prescriptions that Dr. Mosley witnessed Walgreens getting filled, Dr. Mosley provides below six examples of patients whose prescribed dosages were so high, a reasonable pharmacist would not consider them serving a legitimate medical purpose. Nonetheless, under the immense pressure of Walgreens' management to sell more opioids and increase store profits, Walgreens repeatedly filled these invalid prescriptions, which occasionally led to grave or other serious consequences.

### Example #1

69.     On or about August 5, 2016, Walgreens store 3713 in Lake Worth, Florida filled an August 4, 2016 prescription ("August 4 prescription") for a 29 years-of-age, female Medicare disability patient (patient "A.H."). The prescription, written by a pain management physician, was for 120 15mg tablets of Oxycodone and to be taken every 6 hours daily for 30 days.

70.     The previous day, on August 4, 2016, A.H. had attempted to fill this prescription at Walgreens store 5078 in Lake Worth. But the pharmacist at store 5078, properly refused to fill the August 4 prescription because it was excessive in quantity and exceptionally dangerous. Indeed, per Walgreens' patient profile, she had just filled a prescription for Oxycodone/Acetaminophen for July 23, 2016 for 30 tablets (store 5078, Lake Worth, Florida) and a second for 12 tablets on July 27, 2016 (store 3713, Lake Worth, Florida). These two prescriptions and the August 4 prescription were written by three different doctors.

71.     After the pharmacist at store 5078 refused to fill the August 4 prescription, A.H. went to store 3713 and that store filled the August 4 prescription. **Shortly after the August 4 prescription was filled, A.H. died of an overdose**.

72.     Walgreens knew, or was willfully blind in ignoring, that the August 4 prescription was not issued for a legitimate medical purpose because, at minimum, the following red flags were evident:

- Oxycodone had been identified as a high-risk drug by the Target Checklist;

- The amount itself 120 15mg tablets, is grossly excessive – the type of dosage reserved for terminally ill cancer patients.

- The PDMP Profile for A.H. shows that, between May 19 and August 5, 2016, she had been prescribed, and Walgreens had filled, prescriptions for 292 tablets of Oxycodone or Oxycodone/Acetaminophen.

22

- The PDMP Profile for A.H. shows Walgreens filled Oxycodone prescriptions from three different doctors between July 23, 2016 and August 5, 2016 and four different doctors between May 19 and August 5, 2016.

- The PDMP Profile for A.H. shows Walgreens filled Oxycodone prescriptions at two different stores between July 23, 2016 and August 5, 2016.

73.     As these red flags indicated, the August 4 prescription was not for a legitimate medical purpose and resulted in the wrongful death of a 29-year-old patient.

74.     Walgreens filled the prescribed orders above, causing false claims to be submitted to, and paid by, Medicare's Part D program.

### Examples # 2 and #3

75.     In other grievous examples, between April 2014 and March 2015, Walgreens store 6832 in Stuart, Florida filled a series of prescriptions of Oxycodone/Acetaminophen, for both a husband and wife in extraordinary quantities.

76.     In or around April 2014, store 6832 filled a prescription dated April 14, 2014 for an elderly Medicare patient (patient "S.J."). The prescription was for 240 tablets of Oxycodone/Acetaminophen (10 mg of Oxycodone and 325 mg of Acetaminophen), amounting to approximately 2,400 mg of Oxycodone in a month. This prescription was also written by a New York doctor and filled in Florida.

77.     In February or March 2015, store 6832 filled another prescription dated February 27, 2015 for S.J.; this time for 540 tablets of Oxycodone/Acetaminophen (10 mg of Oxycodone and 325 mg of Acetaminophen), amounting to approximately 5,400 mg of Oxycodone in a month. This prescription, while filled in Florida, was also written by a New York at the same practice as the New York doctor who wrote the prior prescription.

78.     On March 10, 2015, per Walgreen's PDMP Profile, store 6832 filled a prescription for S.J.'s husband, F.J., for 540 tables of Oxycodone/Acetaminophen (10 mg of

Oxycodone and 325 mg of Acetaminophen), amounting to approximately 5,400 mg of Oxycodone in a month.

79.    Walgreens knew, or was willfully blind in ignoring, that these excessive quantities of Oxycodone/Acetaminophen were not prescribed for a legitimate medical purpose because, at minimum, the following red flags were evident:

- 1080 tablets of Oxycodone/Acetaminophen prescribed to a husband and wife within a two-month period is extraordinarily excessive in quantity;

- Oxycodone/Acetaminophen is cocktail drug that, although not identified on the Target Checklist, poses the same risks as Oxycodone, which is identified on the Target Checklist;

- The two prescriptions available were written by New York doctors at the same practice and were filled in Florida, violating Walgreens' protocol as of October 2011 that required pharmacists "to only fill for patients in [the] **State** where [the] patient lives and must be validated with proper ID." *See* Exhibit 5.

80.    Walgreens filled the prescribed orders above, causing false claims to be submitted to, and paid by, Medicare's Part D program.

## Example #4

81.    On or about November 20, 2017, a disabled Medicare patient (patient "T.S.") presented himself at Walgreens store 6832 with a prescription for 120 8mg tablets of Hydromorphone. The patient presented this prescription to Dr. Mosley, who was working in the store.  Dr. Mosley recognized the prescription could serve no legitimate medical purpose. Dr. Mosley therefore, called the doctor who wrote it, and advised the doctor that the dosage quantity was excessive and presented a danger to the patient.  The doctor responded that Dr. Mosley should not fill it.

82.    Despite the doctor retracting the excessive prescription, the PDMP Profile shows that Walgreens already had filled prescriptions for Hydromorphone in similar dosages on June

20, 2016 (90 tables); August 1, 2016 (120 tables); November 1, 2016 (120 tablets); and April 24, 2017 (120 tablets).

83.    Walgreens knew, or was willfully blind in ignoring, that these excessive quantities of Oxycodone/Acetaminophen were not prescribed for a legitimate medical purpose because, at minimum, the following red flags were evident:

- Hydromorphone had been identified as a high-risk drug by the Target Checklist;

- The prescription was written by a primary care physician, not a pain management doctor;

- The PDMP Profile shows the T.S. had been taking Hydromorphone in these large quantities since June 20, 2016;

- 120 tables of 8 mg of Hydromorphone is on its face excessive.

84.    Walgreens filled the prescribed orders above, causing false claims to be to, and paid by, Medicare's Part D program.

**Example #5**

85.    From September 2016 through October 2017, Walgreens store 6832 filled prescriptions for a female Medicare patient (patient "D.D.") for excessive quantities of Percoset, containing 10mg of Oxycodone and 325mg of acetaminophen, as follows:

| | |
|---|---|
| 9/1/16 | 90 tablets of Percoset 10/325 |
| 9/29/16 | 90 tablets of Percoset 10/325 |
| 10/27/16 | 90 tablets of Percoset 10/325 |
| 11/17/16 | 90 tablets of Percoset 10/325 |
| 12/15/16 | 90 tablets of Percoset 10/325 |
| 1/16/17 | 90 tablets of Percoset 10/325 |
| 2/13/17 | 90 tablets of Percoset 10/325 |

| 3/13/17 | 90 tablets of Percoset 10/325 |
| 4/10/17 | 90 tablets of Percoset 10/325 |
| 5/8/17 | 90 tablets of Percoset 10/325 |
| 5/8/17 | 90 tablets of Percoset 10/325 |
| 7/10/17 | 90 tablets of Percoset 10/325 |
| 8/21/17 | 90 tablets of Percoset 10/325 |
| 9/25/17 | 90 tablets of Percoset 10/325 |
| 10/23/17 | 90 tablets of Percoset 10/325 |

86.     Walgreens knew, or was willfully blind in ignoring, that these excessive quantities of Percoset were not prescribed for a legitimate medical purpose because, at minimum, the following red flags were evident:

- Oxycodone/Acetaminophen is cocktail drug that, although not identified on the Target Checklist, poses the same risks Oxycodone, which is identified on the Target Checklist;

- The PDMP Profile for D.D. shows the she had been taking Percoset for over a year.

- 90 tablets per month is excessive.

- There are four different forms of signatures on the prescriptions for the same prescribing physician, suggesting that the actual physician did not sign at least three of the prescriptions himself, which would render the prescriptions invalid.

87.     Walgreens filled the prescribed orders above, causing false claims to be submitted to, and paid by, Medicare's Part D program.

**Example #6**

88.     From June 2015 through May 2016, Walgreens store 6832 filled prescriptions for

a male Medicare patient (patient "J.F.") for excessive quantities of Hydromet cough syrup (liquid

Oxycodone) and Hydrocodone Acetaminophen 5-325 tablets as follows:

| | |
|---|---|
| 5/12/16 | 480ml of Hydromet syrup |
| 4/28/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 4/21/16 | 480ml of Hydromet syrup |
| 4/01/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 3/23/16 | 480ml of Hydromet syrup |
| 3/9/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 2/28/16 | 480ml of Hydromet syrup |
| 2/6/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 2/2/16 | 480ml of Hydromet syrup |
| 1/15/16 | 480ml of Hydromet syrup |
| 1/12/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 12/22/16 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 12/19/16 | 473ml of Hydromet syrup |
| 12/3/25 | 480ml of Hydromet Syrup |
| 12/12/15 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 11/11/15 | 480ml of Hydromet Syrup |
| 11/11/15 | 150 tablets of Hydrocodone-Acetaminophen 5-325 |
| 11/2/15 | 240ml of Hydromet Syrup |
| 10/30/15 | 120 tablets of Hydrocodone-Acetaminophen 5-325 |

| 10/23/15 | 240m of Hydromet Syrup |
| 10/1/15 | 120 tablets of Hydrocodone-Acetaminophen 5-325 |
| 9/9/15 | 100 tablets of Hydrocodone-Acetaminophen 5-325 |
| 8/13/15 | 100 tablets of Hydrocodone-Acetaminophen 5-325 |
| 7/21/15 | 100 tablets of Hydrocodone-Acetaminophen 5-325 |
| 7/1/15 | 100 tablets of Hydrocodone-Acetaminophen 5-325 |
| 6/2/15 | 100 tablets of Hydrocodone-Acetaminophen 5-325 |

89. Walgreens knew, or was willfully blind in ignoring, that these excessive quantities of Hydromet syrup and Hydrocodone-Acetaminophen 5-325 tablets were not prescribed for a legitimate medical purpose because, at minimum, the following red flags were evident:

- Hydrocodone-Acetaminophen is cocktail drug that, although not identified on the Target Checklist, poses the same risks as Oxycodone;

- 150, 120, and 100 tablets are all excessive;

- Hydromet syrup is a cocktail drug, i.e., liquid Oxycodone;

- 480ml and 240ml of Hydromet syrup are excessive dosages;

- Both drugs were prescribed for a year;

- Both drugs were prescribed and dispensed in close proximity to each other, including one example in which they were filled together on the same day on 11/11/15.

90. Walgreens filled the prescribed orders above, causing false claims to be submitted to, and paid by, Medicare's Part D program.

CONDITIONS PRECEDENT

91. Relator has satisfied all conditions precedent or such conditions have been waived.

## COUNT I
### 31 U.S.C. § 3729(A)(1)(A)

92.    The Relator realleges the allegations made in Paragraphs 1 through 91.

93    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

94.    Through the acts described above, Walgreens and its agents and employees knowingly presented and caused to be presented to the Government or its intermediaries, false or fraudulent claims.

95.    The Government, or its intermediaries, unaware of the falsity of the claims made or caused to be made by the Walgreens, approved, paid, and participated in payments made by the Government's fiscal intermediaries for claims that were material to, and  otherwise would not have been allowed.

96.    As a result of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT II
### 31 U.S.C. § 3729(A)(1)(B)

97.    The Relator realleges the allegations made in Paragraphs 1 through 91.

98.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

99.    Through the acts described above, Walgreens knowingly made, used and caused to be used false records and statements material to get false or fraudulent claims paid or approved by the Government.

100.    The Government was unaware of the falsity of the records, statements, and claims submitted by Walgreens and its agents, principals, employees, and contractors for claims that

were material to, and otherwise would not have been paid had the truth been known.

101.   By reason of the Walgreens' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

<div align="center">

**RELIEF REQUESTED**

</div>

WHEREFORE, the Relator requests that judgment be entered against Walgreens and provides as follows:

a.   Walgreens cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.   Walgreens pay an amount equal to three times the amount of damages the Government has sustained because of Walgreens' actions, plus a civil penalty against Walgreens of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.   Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

d.   Relator be awarded all costs of this action, including attorneys' fees and expenses; and

e.   Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the Relator demands a trial by jury.

Respectively submitted on May 10, 2019.

**McCabe Rabin, P.A.**
1601 Forum Place, Suite 201
West Palm Beach, FL 33401
Telephone: (561) 659-7878

_____ 540001
Adam T. Rabin
Florida Bar No. 985635
arabin@mccaberabin.com
e-filing@mccaberabin.com
Ryon M. McCabe
Florida Bar No. 09075
rmccabe@mccaberabin.com

**Searcy Denney Scarola Barnhart & Shipley, P.A.**
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Rosalyn Sia Baker-Barnes
Florida Bar No.: 327920
rsb@searcylaw.com
baker-barnesteam@searcylaw.com
jef@searcylaw.com
tat@searcylaw.com

*Counsel for Relator*